UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Estate of Patricia Metzermacher, by Michael Metzermacher, Administrator, et al.,<br>    *Plaintiffs*,<br><br>           *v.*<br><br>National Railroad Passenger Corp. a/k/a Amtrak, et al.,<br>    *Defendants*. | Civil No. 3:05cv1964 (JBA) |

**RULING ON MOTION TO DISMISS BY
RENO AGRICULTURE & ELECTRONICS, INC.**

In this diversity action, decedents of the Plaintiffs were killed when an Acela train struck their automobile while it was trapped within a four-quadrant grade crossing in Waterford, Connecticut. Plaintiffs' complaint claims that the collision occurred, at least in part, because the C-401-R-KIT vehicle detectors used in the crossing were defectively designed and negligently tested by Defendant Reno Agriculture & Electronics ("Reno"). (6th Am. Compl. at 42 ¶ 17, 45 ¶ 17.) Reno has moved to dismiss this action against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons set forth below, Reno's motion is denied.

**I.    Factual Background**

On September 28, 2005, at approximately 7:45 a.m., Plaintiffs' decedent, Patricia Metzermacher, was driving her Ford Taurus automobile north on Miner Lane, a public highway, in Waterford, Connecticut. With Metzermacher in the car were her grandchildren, Plaintiffs' decedents Zachary Metzermacher and Courtney Metzermacher . (6th Am. Compl. at 7 ¶ 18.) While on Miner Lane, Metzermacher entered a four-quadrant grade crossing owned by Defendant Amtrak. (*Id.* at 7 ¶ 19.) Both the entrance and exit gates of the crossing

lowered, trapping the Taurus, which was then struck by a westbound Acela train owned and operated by Amtrak, resulting in the death of all three occupants. (*Id*. at 8 ¶ 20.)

The Miner Lane crossing was installed in 1999 and became operational in 2000. (*Id*. at 22 ¶ 39.) The prototype for this design was the School Street crossing in Mystic, Connecticut, which was installed in 1998 as the first four-quadrant grade crossing in the United States. (Watson Dep. 34:23–35:1, 40:2, Aug. 10, 2007; Lockard Dep. 49:3–8, Feb. 11, 2008.) An integral component of the School Street crossing was its vehicle detector, which was supplied by Reno. (Watson Dep. 87:12–13; Lockard Dep. 46:9–47:3.) This detection system was a modification of Reno's standard Model C vehicle detector and was specifically procured by Amtrak for the School Street prototype. (Pls.' Ex. 10; Pls.' Ex. 12; Lockard Dep. 48:18–22.) Amtrak sought out these detectors from Reno (Lockard Dep. 132:24–133:2), and, as early as May 5, 1998, Reno's President (Tom Potter) began working with Amtrak to develop this vehicle detector. (Pls.' Ex. 10; Pls.' Ex. 12; Lockard Dep. 37:12–38:13, 55:12–18, 88:7–91:19.) In the course of developing this modified version, Potter spoke by phone with Paul Lockard (an Amtrak engineer), corresponded by letter with him, and met him in person in Pennsylvania. (Lockard Dep. 37:5–38:19, 55:4–23, 88:7–91:19.) When asked at his deposition on September 4, 2007 whether he was aware that Reno products were used in the School Street crossing in Mystic, Connecticut, Potter replied, "I kind of recall that there was discussion of that," but denied that he had any involvement in "the design or the application" of the products. (Potter Dep. 22:15–23:8, Sept. 4, 2007.)

William Watson (a former Amtrak field engineer) testified at his deposition that he recalled that a Reno employee, whom he remembered to be Tom Potter's son, went to Mystic, Connecticut to help Amtrak adjust, balance, and test the vehicle detector once it was

2

installed in the School Street crossing. (Watson Dep. 90:4–7, 91:10–23, 93:4–5, 101:1–14.) Additionally, Watson said that he dealt with Reno—including Tom Potter and his son—during the installation of the School Street crossing and recalled a discussion with someone at Reno about the depth of the saw cuts in the pavement where the detector loops were to be installed. (*Id.* at 87:4–8, 90:1–4, 94:16–19.)

After the installation of the School Street prototype, Amtrak continued to install Reno's vehicle detectors in its other four-quadrant grade crossings in Connecticut, including the one at Miner Lane. (Pls.' Opp'n 7.) On August 5, 1999, Carl Zabel (Reno's Vice President of Sales and Marketing) wrote to an Amtrak employee regarding the sale and purchase of twenty-four C-401-R-KIT vehicle detectors. (Pls.' Ex. 1.) Then, on August 25, 1999, Lockard, who worked at Amtrak's Communications & Signals Repair Shop in Pennsylvania, completed an Amtrak Material Requisition Form in which he requested that Amtrak order twenty-four C-401-R-KIT detectors directly from Reno's manufacturing plant in Reno, Nevada and listed the six four-quadrant grade crossings, including the crossing at Miner Lane, in which they would be used. (Pls.' Ex. 3; Lockard Dep. 43:3–47:3.) Amtrak ordered those detectors, and, as part of that order, the completed Reno C-401-R-KIT vehicle detector used at Miner Lane was received by Amtrak's Pennsylvania shop before being sent to Connecticut, in accordance with Amtrak's procedures. (*Id.* at 128:6–23.) On September 15, 1999, Reno's Zabel forwarded to Amtrak new specification sheets, which provided installation and operating instructions for these C-401-R-KIT vehicle detectors. (Pls.' Ex. 2.) When Tom Potter was asked whether he was aware that these Reno detectors were "in use in Connecticut at the four-quadrant gate crossings," he testified, "[i]n very general terms, I heard there was—now that you brought Bill Watson's name up, there was—you know, they

3

were doing some work with that." (Potter Dep. 64:22–65:4.)

II.  **Discussion**

When responding to a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), plaintiffs bear "the burden of establishing that the court has jurisdiction over the defendant." *Bank of Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). Discovery pertaining to personal jurisdiction has been allowed here, so plaintiffs' "prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt*, 902 F.2d 194, 197 (2d Cir. 1990).

Where federal diversity jurisdiction is invoked, personal jurisdiction may be exercised to the same extent as the courts of the state in which the federal court sits. Fed. R. Civ. P. 4(k)(1)(A). Under Connecticut law, this entails a two-step analysis. *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 1995). First, the Court must determine whether Connecticut law would confer upon its courts jurisdiction over the defendant under the appropriate long-arm statute, here Connecticut General Statutes § 33-929(f). *See id.* If there is a statutory basis for jurisdiction, the Court must then ascertain whether the exercise of jurisdiction would be permissible under the Due Process Clause of the Fourteenth Amendment. *Bank of Brussels Lambert*, 171 F.3d at 784.

A.  **Long-Arm Jurisdiction**

Under Connecticut law, personal jurisdiction may be exercised over a foreign corporation, "whether or not such foreign corporation is transacting or has transacted business in this state," where the cause of action arises "out of the production, manufacture

4

or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in [Connecticut] and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers." Conn. Gen. Stat. § 33-929(f)(3). Plaintiffs rely on this jurisdictional basis.

The principal dispute between the parties with respect to § 33-929(f)(3) is whether Reno had the "reasonable expectation" that its vehicle detectors would be used in Connecticut. Reno asserts that because there was "no link between Reno and [Connecticut]," Reno did not have any reasonable expectation that its products would be used there. (Mot. to Dismiss 7.) Plaintiffs contend that § 33-929(f)(3) applies because Reno should have reasonably expected that its vehicle detectors would be used in Connecticut based on communications between Reno and Amtrak and the visit of a Reno employee to Connecticut to help test the School Street crossing. (Pls.' Opp'n 5–8.) The record in this case supports Plaintiffs' position.

The plain language of § 33-929(f) does not require a foreign corporation to have ever transacted business in Connecticut. *See In re Connecticut Asbestos Litigation*, 677 F. Supp. 70, 72 (D. Conn. 1986); *accord Lombard Bros., Inc. v. General Asset Management Co.*, 460 A.2d 481, 485 (Conn. 1983). The statute merely looks to whether the defendant should have had a reasonable expectation that at least one of its goods would reach the state of Connecticut. *See Ensign-Bickford Co. v. ICI Explosives USA Inc.*, 817 F. Supp. 1018, 1028 (D. Conn. 1993). This enables "Connecticut courts to reach manufacturers in product liability suits where the defendants did not themselves ship their products to Connecticut," if a corporation has, or should have, a "reasonable expectation" that its goods will be used in

Connecticut. *Whelan Engineering Co., Inc. v. Tomar Electronics, Inc.*, 672 F. Supp. 659, 664 (D. Conn. 1987) (finding jurisdiction where the defendant did not specifically target the Connecticut market but engaged the services of a national marketing and distribution company with the knowledge and belief that one of the territories it covered was Connecticut) (citing *Buckley v. New York Post Corp.*, 373 F.2d 175, 177–78 (2d Cir. 1967) (examining the Connecticut long-arm statute)).

In this case, the deposition of William Watson shows that Reno had actual knowledge that its vehicle detectors were used in Connecticut because Reno sent an employee to Connecticut and provided telephone support to aid in the installation and testing of the Reno detectors at the School Street crossing in 1998. Watson testified that "[Potter's] son came to the crossing during the initial testing to—well, he provided info as to how they should be installed and then testing [*sic*]" (Watson Dep. 90:4–7)[1] and that he, Watson, "was in conversation with the owner," whom he later identified to be Potter, during the installation process. (*Id* at 90:1–4.)

In the course of his conversations with Watson during the School Street installation,[2] Potter learned that Amtrak was working on developing the vehicle detection systems for other Connecticut crossings, an integral aspect of which was Reno vehicle detectors, and thus had notice that Reno vehicle detectors would be used in Connecticut. When asked at

---

[1] Although Reno notes that Potter's only son, Thomas B. Potter, claimed at his deposition that he had never been to Connecticut (Mot. to Dismiss 14), this testimony fails to demonstrate that no Reno employee visited the School Street crossing or that Watson's testimony to the contrary should be disbelieved.

[2] There is nothing in the record that suggests that Watson, an Amtrak field engineer, and Tom Potter, Reno's President, had any communications other than during the 1998 installation of the School Street crossing.

his 2007 deposition if he had "heard anything about the [vehicle detection] system that was in use in Connecticut at the four-quadrant gate crossings," Potter replied, "In very general terms, I heard there was—now that you brought Bill Watson's name up, there was—you know, they were doing some work with that." (Potter Dep. 64:22–65:3.)

Therefore, because Reno, through its owner and employee, had actual knowledge that Reno products had been used in 1998 at the State Street crossing in Connecticut and because Watson told Reno that Amtrak would be using Reno vehicle detection systems at other Connecticut crossings, Reno had a reasonable expectation, prior to distributing its second run of detectors from its factory, that its detectors likely would be used in Connecticut. Thus, § 33-929(f)(3) applies.[3]

**B.      Due Process**

Because Reno is amenable to suit under Connecticut's long arm statute, its motion to dismiss must be denied unless exercising personal jurisdiction would offend its constitutionally protected due process rights, *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996), requiring that the defendant have "minimum contacts" with Connecticut "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

---

[3] The language of § 33-929(f)(3) provides jurisdiction in any cause of action arising "out of the production, manufacture or distribution of goods" by the defendant. In this case, in addition to the products liability claim, Plaintiffs' negligence claim, alleging that Reno "knew or should have known, of the dangerous propensities of its Vehicle Detection System and its component parts, yet continued to assure its effectiveness for use at the Miner Lane, Waterford, Connecticut railway crossing" (6th Am. Compl. 45 ¶ 17(e)), also arises out of the distribution of goods with the reasonable expectation that such goods would be consumed in Connecticut, and jurisdiction is proper over Reno on both the products liability and the negligence claims.

### 1. Minimum contacts

Specific personal jurisdiction may be exercised if the foreign defendant has purposefully established significant contact with the forum state and the plaintiff's cause of action arises out of or is related to the defendant's forum contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S.462, 472, 486 (1985); *Metro. Life Ins. Co.*, 84 F. 3d at 568. In order to determine that the requisite minimum contacts exist, "[I]t is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of the laws." *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 84-85 (2d Cir. 1995) (emphasis in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 254 (1958)). Thus, Reno must have taken some action "purposefully directed toward" Connecticut. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987). In other words, there must be facts that demonstrate that the defendant attempted "to serve, directly or indirectly, the market for its product" in Connecticut. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir. 1999) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Ordinarily, unforeseen and unintended unilateral acts of third parties that constitute contacts with the forum state will not support jurisdiction because the defendant would lack "fair warning" that it and its property may be subject to the exercise of that forum state's power. *See Bensmiller*, 47 F.3d at 85. When the defendant does have knowledge that the third party will act in such a way as to establish contacts between the defendant and the forum state, then the defendant may be found to have purposefully availed itself of the privilege of conducting activities there, and jurisdiction over it is proper. *See, e.g., Ensign-Bickford Co.*, 817 F. Supp. at 1030 (finding that a Canadian corporation purposefully availed

itself of the Connecticut market by selling its products to an U.S. corporation that it knew, or should have known, distributed its goods to retailers across the U.S., including one in Connecticut, and by working with that U.S. corporation to ensure successful entry of its products into the U.S. market).

Plaintiffs contend that this Court has specific jurisdiction over Reno because (1) a Reno employee came to Connecticut to adjust, balance, and test the Reno vehicle detection system at the School Street crossing, which served as the model for the Miner Lane crossing; (2) the correspondence between Reno and Amtrak in 1998 and 1999 demonstrates that Reno should have reasonably expected that its vehicle detectors would be used in Connecticut rail crossings; and (3) Reno modified and sold its vehicle detectors used in Connecticut at the request of Amtrak. (Pls.' Opp'n 11.)

Reno argues that this Court has no specific jurisdiction because (1) none of the exhibits demonstrate an intent or awareness by Reno to serve the Connecticut market and the correspondence, mailed to and from Pennsylvania, does not reference Connecticut; (2) the Reno-Amtrak contact neither originated nor took place in Connecticut; (3) the Reno vehicle detectors were sought out by Amtrak; and (4) the Reno vehicle detectors were ordered from and received in Pennsylvania. (Reno's Reply 6.) Thus, Reno urges, there is no basis from which to infer that Reno had any expectation that its products would be used or consumed in Connecticut. (*Id.*)

In *Kernan*, the Second Circuit found that a foreign corporation had purposefully availed itself of the New York market by entering into an exclusive sales agreement that contemplated that a third party would sell the foreign corporation's products throughout North America. 175 F.3d at 243. The court determined that there was sufficient basis to

conclude that the Defendant foreign corporation attempted to serve, albeit indirectly, the New York market, having been put on notice that its products could be sold by the third party in any state. *Id.* Similarly, Reno was put on notice that the vehicle detectors would be used in Connecticut and attempted to serve this market by distributing the detectors to Amtrak, albeit in the latter's Pennsylvania office, for use in Connecticut, thereby purposefully availing itself of the Connecticut installation opportunities.

The second prong of the minimum-contacts analysis is also met because Plaintiffs' products liability claims are related to Reno's forum contacts. Plaintiffs' products liability claims are targeted against Reno's C-401-R-KIT vehicle detection systems, which were used in the construction of the Miner Lane crossing in Waterford, Connecticut as a result of Reno's indirect service of the Connecticut market through Amtrak. Thus, exercise of personal jurisdiction over Reno does not violate Reno's due process rights for lack of minimum contacts.[4]

### 2. *Fair play and substantial justice*

The due-process analysis next looks to whether the exercise of jurisdiction over Reno comports with fair play and substantial justice, weighing several factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of justice of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life Ins. Co.*, 84 F. 3d at 568 (citing *Asahi*, 480 U.S. at 113–14). "[D]epending upon

---

[4] In light of the conclusion that this Court can exercise specific jurisdiction in this case, the question of general jurisdiction raised by the parties need not be addressed.

the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." *Id.* (citing *Burger King*, 471 U.S. at 477).

Plaintiffs contend that Connecticut jurisdiction is constitutionally reasonable because (1) the accident and alleged tortious conduct occurred in Connecticut; (2) the physical evidence and witnesses to the accident are located in Connecticut; (3) Connecticut has a substantial interest in adjudicating a personal injury claim where the death of three Connecticut residents occurred in a Connecticut rail crossing; and (4) modern technology and means of travel have alleviated much of the difficulty of defending a case for out-of-state defendants. (Pls.' Opp'n 12.) Reno counters that it would be unfair for this Court to assert jurisdiction over it because its vehicle detectors were unilaterally brought to Connecticut by Amtrak. (Reno's Reply 8.)

The exercise of jurisdiction over Reno has not been shown to impose any significant or specific burden. The geographical distance between Nevada and Connecticut is mitigated by contemporary modes of communication and transportation. *See Metro. Life Ins. Co.*, 84 F.3d at 574. Therefore, the burden weighs only slightly in Reno's favor.

On the other hand, Connecticut has a substantial interest in adjudicating this claim in which three Connecticut residents died in Connecticut, allegedly as a result of tortious conduct on the part of Reno. *See Kernan*, 175 F.3d at 244 (finding that the forum state had a substantial interest in a case where the person injured was a resident of the forum state and where the negligence laws of the forum state would apply). Connecticut has a distinct interest in providing a forum for its citizens who claim to be injured by companies that purposefully avail themselves of doing business in this state.

Further, Plaintiffs' interest in keeping Reno in the Connecticut case is strong. If Connecticut courts could not exercise personal jurisdiction over Reno, Plaintiffs would be forced to bring a separate action against Reno—which is only one of seven defendants in this action—and prosecute a second action in another forum, presumably in Nevada. Therefore, this factor weighs in favor of finding personal jurisdiction over Reno. *See Kernan*, 175 F.3d at 245 (determining that the plaintiff had a strong interest in the court being able to exercise jurisdiction over a third-party defendant because otherwise the third-party plaintiff would have to relitigate its case in a foreign forum).

When analyzing the efficient administration of justice, "courts generally consider where witnesses and evidence are likely to be located." *Id*. In this case, some of the witnesses and evidence are located in Connecticut, while other evidence and witnesses are located in Nevada and Pennsylvania. The most significant piece of evidence, the four-quadrant grade crossing, is located in Connecticut, but this is of little significance because it is unlikely that the jury will be taken there for a viewing when photographs and video can be easily and effectively used. Thus, this factor favors neither party.

With regard to the shared interest of the states in furthering substantive policies, neither party has suggested or demonstrated any substantive social policies that would be furthered by allowing this case to be heard in Connecticut. Therefore, this factor does not weigh in either party's favor.

On balance, the factors favor Plaintiffs. The modest burden that Reno would bear by litigating this action in Connecticut is outweighed by the stronger interest in affording the decedents' families a convenient forum in which to obtain relief.

### III.     Conclusion

The Court concludes that Reno is subject to long-arm jurisdiction in Connecticut and that the exercise of personal jurisdiction over Reno would not violate its due-process rights.  Accordingly, Reno's Motion to Dismiss [Doc. # 240] is denied.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of July, 2008.